RECEIVED
NOV 23 2026
U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MISSOURI

EASTERN DIVISION

ZACHARY ROBERT ROACH,
Plaintiff,
v. Case No. ____________
OS RESTAURANT SERVICES LLC
d/b/a OUTBACK STEAKHOUSE, and
BLOOMIN' BRANDS, INC.,
Defendants.
**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION AND RETALIATION

Plaintiff Zachary Robert Roach, representing himself, states as follows:

## I. THE PARTIES

1. Plaintiff Zachary Robert Roach ("Plaintiff" or "Roach") is an adult resident of St. Charles County, Missouri. He was employed by Defendants at the Outback Steakhouse restaurant located at 5228 N. Service Road, St. Peters, Missouri, from February 2024 until his termination on November 6, 2025.

2. Defendant OS Restaurant Services LLC d/b/a Outback Steakhouse ("OS Restaurant Services") operated the Outback Steakhouse restaurant in St. Peters, Missouri where Plaintiff worked. It is the respondent named in EEOC Charge No. 560-2026-01457 and Missouri Commission on Human Rights Complaint No. FE-02/26-40294.

3. Defendant Bloomin' Brands, Inc. ("Bloomin' Brands") is a Delaware corporation with its principal place of business at 2202 N. West Shore Boulevard, Suite 500, Tampa, Florida 33607. Bloomin' Brands is the parent company of the Outback Steakhouse restaurant chain and of OS Restaurant Services. It is the respondent named in EEOC Charge No. 560-2026-02137

and Missouri Commission on Human Rights Complaint No. FE-03/26-40482.

4. Defendants are employers within the meaning of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111(5), and the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. § 213.010. Plaintiff alleges that Defendants acted as joint employers, and as an integrated enterprise, with respect to his employment: Bloomin' Brands exercised centralized control over labor relations and employment decisions, including through its Director of Employment Law, who directed the response to Plaintiff's charge of discrimination against OS Restaurant Services; and Plaintiff's workers' compensation claims were administered by CorVel as claims administrator for Bloomin' Brands, Inc., the insured client named in the administrator's own claim acknowledgment letter. Defendants employ far more than 500 employees.

5. At all relevant times, the managers identified in this Complaint — including Proprietor Taylor Adams, manager Britni, and manager Jazmine Ross, who terminated Plaintiff's employment — acted as Defendants' agents and within the scope of their authority over Plaintiff's employment.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question), 42 U.S.C. § 12117(a), and 42 U.S.C. § 2000e-5(f). This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a) because those claims arise from the same facts as the federal claims.

7. Venue is proper in this District and Division under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391(b) because the unlawful employment practices occurred in St. Peters, St. Charles County, Missouri, where Plaintiff would have continued to work but for Defendants' unlawful conduct.

## III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

8. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 560-2026-01457, against OS Restaurant Services LLC d/b/a Outback Steakhouse, dual-filed with the Missouri Commission on Human Rights ("MCHR") as Complaint No. FE-02/26-40294. The charge alleged discrimination based on disability and retaliation.

9. Plaintiff timely filed a second Charge of Discrimination with the EEOC, Charge No. 560-2026-02137, against Bloomin' Brands, Inc. d/b/a Outback Steakhouse, dual-filed with the MCHR as Complaint No. FE-03/26-40482. The charge alleged discrimination based on disability and retaliation.

10. On August 25, 2026, the EEOC issued a Determination and Notice of Rights (right-to-sue notice) for each charge. Copies of both EEOC right-to-sue notices are attached to this Complaint.

11. The MCHR issued its notice for Complaint No. FE-02/26-40294 by letter dated August 28, 2026, and its notice for Complaint No. FE-03/26-40482 by letter dated September 25, 2026.

12. This lawsuit is filed within 90 days of Plaintiff's receipt of each EEOC right-to-sue notice and within the periods allowed by Mo. Rev. Stat. § 213.111.1, and within two years of the acts complained of. All conditions precedent to suit have been performed or have occurred.

## IV. FACTS

### *A. Plaintiff's employment*

13. Plaintiff began working at Defendants' Outback Steakhouse in St. Peters, Missouri in February 2024. His position was Assistant Kitchen Manager. He earned $21.50 per hour, a rate Defendants' own workers' compensation filing confirms.

14. Plaintiff performed his job successfully. He had never injured his right arm before the events described below.

*B. First injury — August 3, 2025 (blood poisoning)*

15. On August 3, 2025, manager Britni called Plaintiff to fix the dish pit for the dishwasher. The dish pit had a safety cap missing. Reaching into the pit, Plaintiff cut his left middle finger open.

16. Britni saw Plaintiff's swollen hand that same day, wrote the injury up herself in the store's own records, and insisted that Plaintiff go for medical care that day.

17. Plaintiff was treated the same day at urgent care and was sent on to the emergency department at St. Joseph Hospital in Lake Saint Louis, Missouri. The emergency department record documents a laceration at the joint of his left middle finger — the same finger that had been burned at work two days earlier — with the infection spreading in streaks up his forearm, a blood-poisoning (cellulitis) course that required IV antibiotics. His arm was marked to track the spread of the infection.

18. Plaintiff filed a workers' compensation claim for this injury, Missouri Division of Workers' Compensation Claim No. 25-068577. The claim was accepted. Defendants' claims administrator assigned its own claim numbers to Plaintiff's other two claims; no CorVel claim number for this claim appears anywhere in the records provided to Plaintiff.

*C. Second injury — September 9, 2025 (right elbow)*

19. On or about September 9, 2025, the weight of a fryer basket injured Plaintiff's right elbow — his dominant arm. He was diagnosed with radial tunnel syndrome and lateral epicondylitis ("tennis elbow").

20. Plaintiff filed a workers' compensation claim for this injury, Claim No. 25-068576. The claim was accepted. His treating doctors prescribed physical therapy three times per week, together with specialist care. (Defendants' claims administrator, CorVel, carried this claim as CorVel Claim No. 1319-WC-25-0302813.)

***D. Third injury — September 13, 2025 (burn)***

21. On September 13, 2025, Plaintiff suffered a hot-oil burn to his left hand, first- and second-degree, in a cooking accident at work. He was treated in the emergency department the same day and referred for burn care. Defendants' own Report of Injury for this accident, prepared by Proprietor Taylor Adams, describes it in Defendants' words: "filtering the fryer and grease from the fryer splashed back burning his left hand."

22. Plaintiff filed a workers' compensation claim for this injury, Claim No. 25-064334. The claim was accepted. His burn treatment continued at the Mercy Burn Clinic, including visits on September 18, 2025 and November 4, 2025. (Defendants' claims administrator, CorVel, carried this claim as CorVel Claim No. 1319-WC-25-0302651.) On October 2, 2025, the CorVel adjuster on this claim, Christen Conner, asked Plaintiff to photograph and send his burn-center paperwork; Plaintiff answered her the same day. No confirmation that the paperwork was received, and no follow-up, ever appears in the record provided to Plaintiff.

23. Plaintiff was back at work the next day, September 14, 2025, because he was told he had to be. Leaving was not approved. In his words: "If I had walked out, I would have been fired."

***E. Defendants refused to accommodate Plaintiff's disabilities and restrictions***

24. As a result of his three work injuries, Plaintiff was disabled within the meaning of the ADA and the MHRA: his injuries substantially limited major life activities including lifting, gripping, bending his right elbow, and performing manual tasks, and Defendants regarded him

as disabled and held a record of his impairments. Those limitations persisted throughout the events of this Complaint: Plaintiff was restricted to lifting no more than one pound, left-handed duty only, in October and November 2025, remained restricted to two pounds with a splint and occupational therapy in December 2025, and remained in prescribed treatment into 2026.

25. Plaintiff's doctors imposed written work restrictions. On October 20, 2025, Total Access Urgent Care (Curtis Steinlage, PA-C) restricted Plaintiff, through November 3, 2025, as follows: no lifting greater than one pound using the right arm; avoid strong gripping and repetitive motion with the right hand; no exercise of the right arm, hand, or wrist; left-handed duty only; wear a splint as directed.

26. Plaintiff gave his restriction paperwork to Taylor Adams, the Proprietor of the St. Peters Outback. Adams refused to accommodate him. In Plaintiff's words, Adams told him: "Roach, are you serious? You're the only one that can do your station. You have to fucking work."

27. It was not one conversation. Adams denied Plaintiff any accommodation at all, for all three injuries: no light duty, no different station, and no other work in the building that Plaintiff could have done within his restrictions. Plaintiff's only choice was to work his station or lose his job.

28. In the weeks the October 20, 2025 restrictions were in force, Defendants gave Plaintiff no left-handed duty and no other work within his restrictions.

29. Defendants never engaged Plaintiff in any interactive process to identify a reasonable accommodation, and never offered any accommodation of any kind.

***F. Defendants disciplined Plaintiff for his injuries and his workers' compensation claims***

30. On September 18, 2025, Plaintiff was seen at the Mercy Burn Clinic for treatment of his burn; the clinic's physician, Michael Smock, MD, signed a work-excuse letter for that day.

Plaintiff clocked out at 4:06 p.m. and then stayed more than 30 minutes off the clock to help. Britni then called him into the office and wrote him up because he "can't perform to par" — on the very day he had been at a burn-treatment appointment, at the same time he could not bend his elbow and skin was coming off his burned hand.

31. On October 9, 2025, while Plaintiff was on the telephone with workers' compensation about his claim and appointment scheduling, Britni told him he had to do better.

32. On November 1, 2025, Plaintiff had been at work since 9:30 a.m. At about noon, in severe elbow pain and almost in tears, he asked to have his shift covered. Manager Jazmine Ross gave him permission: if he could get someone to cover his shift, he could leave. Plaintiff got the shift covered and went home. Defendants then wrote him up for that same absence, and Ross called him "being a cry baby about my elbow" and told him he should "suck it up."

***G. Termination — November 6, 2025***

33. On November 6, 2025, Jazmine Ross terminated Plaintiff's employment.

34. Plaintiff alleges, based on Defendants' own HotSchedules logbook records, that all three attendance write-ups used against Plaintiff were created by Ross on November 6, 2025, within approximately four minutes of one another — the same morning Plaintiff was fired — for dates before the firing. Plaintiff never signed any of the write-ups. Plaintiff alleges, as he reported to his employment counsel on October 9, 2026, that he was fired first and the paperwork appeared around it: the write-ups were created after the fact to manufacture a paper justification for a termination that had already happened.

35. Defendants' stated basis for the termination was an attendance-point total built on August 30, 2025, November 1, 2025, and November 6, 2025 — a basis Defendants' own counsel later confirmed in writing on March 16, 2026. The November 1 point is the absence Ross had given

Plaintiff permission to take, and the November 6 point is dated the day of the termination itself.

36. Approximately two weeks after firing Plaintiff, Defendants terminated Ross herself. Plaintiff reported to his employment counsel on January 7, 2026, that Ross was terminated for malicious intent against employees.

37. Plaintiff was fired because he was hurt at work, because he was disabled and needed accommodation, and because he exercised his rights under the Missouri workers' compensation law. The attendance record Defendants rely on was created after the fact, on the morning of the firing, to cover the real reasons.

***H. After the termination — the treatment and the checks that never came***

38. Plaintiff's injuries did not end when Defendants fired him. On December 11, 2025, his treating specialist, Christopher John Dy, MD, of Washington University Orthopaedic Surgery, documented his diagnoses — right lateral epicondylitis and radial tunnel syndrome of the right arm — and restricted him to lifting no more than two pounds with the injured hand, wearing a splint, with occupational therapy recommended.

39. Plaintiff's elbow required a full wrist brace. He was advised that surgery on the elbow would be required, as he reported to his employment counsel on February 2, 2026. As of June 27, 2026, twelve of his prescribed physical therapy visits remained unused, and a further evaluation by Dr. Dy and the elbow injection remained outstanding.

40. On April 15, 2026, Plaintiff underwent an MRI of the right elbow at Imaging Partners of Missouri in Chesterfield, authorized through Defendants' claims administrator (CareIQ Authorization No. MS2604001037). That MRI is when he was told he needed injections in the elbow.

41. On October 5, 2026, an Administrative Law Judge of the Missouri Division of Workers' Compensation, Judge Ottenad, directed Defendants to authorize the diagnostic tests and injections their own second-opinion doctor, Dr. Brown, had recommended. Defendants' counsel confirmed that authorization in writing to the judge.

42. The authorized treatment was never provided. Defendants' counsel stated in writing that "Dr. Brown won't see him back for the injections" and that he "may need to find a different provider for them." A Dr. Rotman was named as the scheduling provider; no appointment was ever made. On October 15, 2026, Plaintiff wrote to Dr. Brown's office himself, asking that the authorized injections be scheduled. He received no reply. On October 26, 2026, Defendants' counsel stated that he would have appointment information "shortly." Nothing was ever scheduled. Plaintiff is left with no treating doctor, and the injections a judge ordered authorized have never been given.

43. The income replacement stopped as well. On April 7, 2026, Defendants' counsel confirmed in writing: "My client confirmed TTD is going to be issued." Eleven weekly checks of $430.00 followed, from May 6, 2026 through July 15, 2026. Then the checks stopped, without explanation. Eighteen weekly checks — $7,740.00 — went unpaid through November 18, 2026, with $430.00 more coming due each week. Defendants' claims administrator, CorVel, has sent Plaintiff nothing at all since May 4, 2026. Plaintiff's counsel filed a motion for hardship mediation on September 30, 2026; no hearing on that motion has ever been set.

44. Plaintiff pleads the facts in paragraphs 38–43 as consequences of the retaliation described in this Complaint and as part of his damages. He does not ask this Court to award workers' compensation benefits; benefit entitlement remains with the Missouri Division of Workers' Compensation, as stated in paragraph 70 below.

***I. Plaintiff's damages***

45. Plaintiff has lost wages of not less than $430.00 per week from November 6, 2025 to the present, totaling more than $23,000.00 through the filing of this Complaint, and he continues to lose wages.

46. The medical bills for the emergency treatment of Plaintiff's work injuries were left unpaid and sent to collections, including $621.84 for the August 3, 2025 emergency department care and $616.00 for the September 13, 2025 emergency department care. Plaintiff's accounts at SSM Health total $33,499.90 due, of which $33,476.64 is in collections, and bills from other providers remain unpaid.

47. Plaintiff lost his private-chef clients — in his words, "the people I cooked for and built my name on" — because his work restrictions kept him from working for them.

48. Plaintiff has mitigated his damages. Because his family was drowning, he took expo work that requires no lifting and no cooking — work within his medical restrictions — and he continues to look for work he can physically do.

49. Plaintiff suffered emotional distress, humiliation, and loss of enjoyment of life. As a direct result of losing his income, Plaintiff and his family lost their home and went through a period of homelessness, sleeping on couches. He was forced to liquidate what he had inherited from his late father, including his father's vehicles, just so his family could survive. The family van fell two months behind and was nearly lost. His electric bill reached roughly $1,000 under a shutoff notice, and he stood in line at a food pantry. In his words: "It took months before I ever saw a check. By the time the first one came, we had already lost our apartment and gone homeless." He drove hundreds of miles to physical therapy and specialist appointments, unreimbursed. He is treated with medication for depression and anxiety. The loss of his income and everything that followed put a severe strain on his marriage, which he and his wife have endured together — his wife stood by him through all of it.

## V. CLAIMS FOR RELIEF

***COUNT I — Disability Discrimination, ADA, 42 U.S.C. § 12112(a)***

(Against both Defendants)

50. Plaintiff repeats and realleges paragraphs 1–49.

51. Plaintiff is a qualified individual with a disability. He could perform the essential functions of his job with reasonable accommodations, including light duty, left-handed duty, and work within his doctors' written restrictions.

52. Defendants discriminated against Plaintiff on the basis of disability by, among other things, writing him up for limitations caused by his disabilities, holding his injuries against him, and terminating his employment on November 6, 2025. His disability was a but-for cause of the termination.

53. Defendants' stated attendance reason is a pretext: the write-ups were created on the morning of the firing, one of the points covers an absence his manager had approved, and one is dated the day of the firing itself. Plaintiff had also been written up on September 18, 2025 — the very day he attended a burn-treatment appointment under a signed medical excuse — for being unable to perform "to par" while injured.

***COUNT II — Failure to Accommodate, ADA, 42 U.S.C. § 12112(b)(5)(A)***

(Against both Defendants)

54. Plaintiff repeats and realleges paragraphs 1–49.

55. Defendants knew of Plaintiff's disabilities and his need for accommodation: he handed his written medical restrictions to the Proprietor, and his restrictions and injuries were documented in Defendants' own records.

56. Reasonable accommodations were available that would not have caused Defendants undue hardship, including left-handed duty as his doctor ordered, light duty, and assignment to work within his restrictions.

57. Defendants failed to provide any reasonable accommodation and refused to engage in the interactive process. The Proprietor's response to the restriction paperwork is quoted at paragraph 26: a flat refusal, with no alternative offered and no discussion of any other work Plaintiff could perform. No good-faith effort to identify or make an accommodation was ever made.

***COUNT III — Retaliation, ADA, 42 U.S.C. § 12203(a)***

(Against both Defendants)

58. Plaintiff repeats and realleges paragraphs 1–49.

59. Plaintiff engaged in protected activity under the ADA by requesting reasonable accommodation, presenting his medical restrictions, and opposing Defendants' refusal to accommodate him.

60. Defendants retaliated against Plaintiff for that protected activity by writing him up on September 18, 2025, criticizing him on October 9, 2025 while he was on the phone about his claim, writing him up for the approved November 1, 2025 absence, and terminating him on November 6, 2025.

61. There is a direct causal connection between Plaintiff's protected activity and these adverse actions, shown by their timing, by the managers' own statements, and by the write-ups created on the morning of the termination.

***COUNT IV — Disability Discrimination and Failure to Accommodate, MHRA, Mo. Rev. Stat. § 213.055***

(Against both Defendants)

62. Plaintiff repeats and realleges paragraphs 1–49.

63. Plaintiff's disability was the motivating factor in Defendants' decisions to deny him accommodation, discipline him, and terminate his employment, in violation of Mo. Rev. Stat. § 213.055. Plaintiff timely obtained right-to-sue notices from the Missouri Commission on Human Rights for both charges, as stated in paragraphs 8–12.

***COUNT V — Retaliation, MHRA, Mo. Rev. Stat. § 213.070***

(Against both Defendants)

64. Plaintiff repeats and realleges paragraphs 1–49.

65. Plaintiff engaged in protected activity under the MHRA by requesting reasonable accommodation for his disabilities and presenting his medical restrictions to Defendants during his employment. Defendants retaliated against him by the discipline and termination described above, in violation of Mo. Rev. Stat. § 213.070(2). His protected activity was the motivating factor in Defendants' actions.

***COUNT VI — Workers' Compensation Retaliation, Mo. Rev. Stat. § 287.780***

(Against both Defendants)

66. Plaintiff repeats and realleges paragraphs 1–49.

67. Plaintiff exercised rights under Chapter 287 of the Missouri Revised Statutes: he reported three work injuries, sought medical care, and filed and pursued workers' compensation Claims Nos. 25-068577, 25-068576, and 25-064334.

68. Defendants discharged and discriminated against Plaintiff for exercising those rights. The exercise of his workers' compensation rights was the motivating factor in his discipline and in

his discharge on November 6, 2025: he was written up while injured and while on the phone about his claim, mocked for his elbow injury by the manager who then fired him, and terminated on the strength of write-ups created that same morning.

69. The retaliation did not stop at the discharge. As stated in paragraphs 38–43, the treatment a judge directed Defendants to authorize was never provided, and the weekly checks Defendants' counsel confirmed would be issued stopped without explanation — leaving Plaintiff with untreated injuries and no income, which is the position Defendants' conduct put him in for exercising his rights.

70. Plaintiff brings this count under Mo. Rev. Stat. § 287.780. He does not ask this Court to award workers' compensation benefits; benefit entitlement remains with the Missouri Division of Workers' Compensation. This count seeks damages for the retaliatory discharge itself.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Zachary Robert Roach asks this Court to enter judgment in his favor and against Defendants, jointly and severally, and to award:

A. Back pay for all wages lost from November 6, 2025 to the date of judgment, at not less than $430.00 per week, together with prejudgment interest — relief that is not subject to the damages caps of 42 U.S.C. § 1981a;

B. Front pay in lieu of reinstatement, or, in the alternative, reinstatement to his position with full seniority and benefits;

C. Compensatory damages for future pecuniary losses, emotional pain and suffering, inconvenience, mental anguish, and loss of enjoyment of life, in the maximum amounts allowed by law, including up to $300,000 under 42 U.S.C. § 1981a(b)(3)(D) and up to $500,000 under Mo. Rev. Stat. § 213.111.4, without double recovery for the same loss;

D. Punitive damages in the maximum amount allowed by law, because Defendants acted with malice and reckless indifference to Plaintiff's federally and state-protected rights — refusing in profane terms to honor any medical restriction, mocking his injury, and manufacturing a paper record on the morning they fired him — including punitive damages under Mo. Rev. Stat. § 287.780, which carries no statutory cap;

E. His costs of this action; and

F. Such other and further relief as the Court deems just.

**PLAINTIFF DEMANDS A TRIAL BY JURY** on all claims and issues so triable, under 42 U.S.C. § 1981a(c), Mo. Rev. Stat. § 213.111.3, and Fed. R. Civ. P. 38.

Respectfully submitted,

______________________________________ Zachary Robert Roach, Plaintiff, pro se 421 Omar Court St. Peters, MO 63376 Telephone: (636) 448-3138 / (636) 544-2869 Email: makeitnu@gmail.com

Date: November 23, 2026

**ATTACHMENTS TO FILE WITH THIS COMPLAINT**

1. EEOC Determination and Notice of Rights (right-to-sue), Charge No. 560-2026-01457, issued August 25, 2026. 2. EEOC Determination and Notice of Rights (right-to-sue), Charge No. 560-2026-02137, issued August 25, 2026. 3. MCHR notice, Complaint No. FE-02/26-40294, dated August 28, 2026. 4. MCHR notice, Complaint No. FE-03/26-40482, dated September 25, 2026.